## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Michael Fiorito,                                    Case No. 22-cv-512 (WMW/TNL)

                    Petitioner,

v.                                                           **REPORT &**
                                                        **RECOMMENDATION**

Warden Fikes,

                    Respondent.

Michael Fiorito, Reg. No. 00414-424, FCI Herlong, P.O. Box 800, Herlong, CA 96113 (pro se Petitioner);[1] and

Ana H. Voss and Kristen Elise Rau, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Respondent).

## I. INTRODUCTION

This matter comes before the Court on pro se Petitioner Michael Fiorito's Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 ("Petition"), ECF No. 1.  This matter has been referred to the undersigned for a report and recommendation to the district court,

---

[1] "For less than nine months . . . , Fiorito was housed at the Federal Correctional Institution in Sandstone, Minnesota ('FCI-Sandstone')." *Fiorito v. Fikes*, Nos. 22-cv-749, 22-cv-759, 22-cv-797 (PJS/TNL), 2022 WL 16699472, at *1 (D. Minn. Nov. 3, 2022), *appeal filed*, Nos. 23-1006, 1007, 1008 (8th Cir. Jan. 3, 2023).  "During his brief stay at FCI-Sandstone, Fiorito filed no fewer than six petitions for a writ of habeas corpus," including this one. *Id.*  "It has long been established that once a court acquires jurisdiction with the initial filing of a habeas corpus petition against a petitioner's immediate custodian, the subsequent transfer of the petitioner and accompanying change in custody does not divest the court of that jurisdiction." *Gianni v. Fed. Bureau of Prisons*, No. 09-cv-1166 (MJD/JSM), 2010 WL 1427318, at *5 n.6 (D. Minn. Feb. 12, 2010), *adopting report and recommendation*, 2010 WL 1427320 (D. Minn. Apr. 9, 2010), *aff'd*, 405 Fed. App'x 96 (8th Cir. 2010); *accord Griffin v. Ebbert*, 751 F.3d 288, 290 (5th Cir. 2014) ("Jurisdiction attached on that initial filing for habeas corpus relief, and it was not destroyed by the transfer of petitioner and accompanying custodial change." (citing cases)).

1

the Honorable Wilhelmina M. Wright, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Fiorito's Petition be **DISMISSED WITHOUT PREJUDICE** for lack of subject matter jurisdiction.

## II. BACKGROUND

Based on publicly available information through the Federal Bureau of Prisons' ("BOP") website, Fiorito is currently confined at the Federal Correctional Institution located in Herlong, California. *Find an inmate.*, *Fed. Bureau of Prisons*, *http://www.bop.gov/inmateloc/*. At the time the Petition was filed, Fiorito had a projected release date of August 22, 2026 via a good-conduct-time release. Decl. of Derrick Lee-Lo ¶ 24, ECF No. 24; *see, e.g.*, Ex. A to Lee-Lo Decl., ECF No. 24-1 at 1-3.[2] Based on the BOP's website, Fiorito now has a projected release date of September 5, 2024. *Find an inmate.*, *Fed. Bureau of Prisons*, *http://www.bop.gov/inmateloc/*.

Fiorito challenges disciplinary proceedings on two incident reports he received in 2016 while confined at the Federal Correctional Institution, located in Ashland, Kentucky ("FCI Ashland"), based on their purported effect on his PATTERN score and eligibility to apply time credits earned under the First Step Act toward time in prerelease custody or supervised release. Fiorito requests that the Court: (1) expunge the incident reports, asserting that he did not commit the charged conduct, the reports were filed in retaliation

---

[2] For ease of reference and in light of the inconsistency in pagination and labelling of exhibits across the filings in this case, the Court utilizes the page numbers generated by the Court's electronic filing system.

for exercising his First Amendment rights, and the disciplinary proceedings violated his right to due process; (2) order the BOP to restore his PATTERN score to Low and grant all time credits earned at the Low PATTERN rate; and (3) require "full due process protections . . . for all levels of incident reports." Pet., ECF No. 1 at 9; Ex. A-1 to Pet., ECF No. 1-1 at 5; *see also Fiorito v. Fikes*, No. 22-cv-512 (WMW/HB), 2022 WL 2276734, at *2 (D. Minn. May 23, 2022) ("Upon learning that his PATTERN risk was increasing, Fiorito filed his Petition for Writ of Habeas Corpus in this District on February 28, 2022. He seeks to have the two FCI-Ashland incident reports expunged from his BOP record on the grounds that the prison staff filed the reports in retaliation for his exercise of First Amendment rights and violated his due process rights when issuing and reviewing the reports, and on the additional ground that he was not guilty of the alleged violations. He then seeks to have BOP staff recalculate his PATTERN risk to low."), ("The habeas petition seeks expungement of incident reports from FCI-Ashland based on constitutional violations by FCI-Ashland staff, and recalculation of Fiorito's PATTERN risk and time credits."), *report and recommendation adopted*, No. 22-cv-512 (WMW/TNL), 2022 WL 2275866 (D. Minn. June 23, 2022). According to Fiorito, if he had "maintained a PATTERN score of Low[,] his release date would show as August 22, 2025." Reply, ECF No. 27 at 2.

In a subsequent filing, Fiorito asserts that, due to his Medium PATTERN score, he is no longer eligible to apply time credits earned under the First Step Act toward time in prerelease custody or supervised release and therefore has "lost that one year." Reply, ECF No. 27 at 2-3.

Later, Fiorito contends that he "never made the argument that his status on the [PATTERN] score is/was an issue." Mot. for Judicial Notice, ECF No. 45 at 2. Rather, according to Fiorito, the issue is that "[d]ue to the false/fictious incident reports issued against [him] at Sandstone and Ashland[, he] lost the 12 months good time that was applied to reduce his sentence." Mot. for Judicial Notice, ECF No. 45 at 2. Fiorito asserts "that incident reports that result in . . . [l]oss of the 12 months of the good time earned under the [First Step Act] require due process." Mot. for Judicial Notice, ECF No. 45 at 2.

## A. FCI Ashland Incidents

In December 2016, Fiorito received two incident reports. Ex. A-1 to Pet., ECF No. 1-1 at 2; Ex. C to Pet., ECF No. 1-1 at 11; Lee-Lo Decl. ¶ 7; *see generally* Ex. E to Lee-Lo Decl., ECF No. 24-5; Ex. F to Lee-Lo Decl., ECF No. 24-6.

### 1. Charged Conduct

#### a. Fiorito's Version

Fiorito is not shy about his "lengthy history of litigation against the BOP since 2014 over the BOP's years long pattern of denying and delaying his medical care," which, according to Fiorito, has resulted in "BOP staff . . . consistently and routinely retaliat[ing] against him which spurred on further litigation." Ex. A-1 to Pet., ECF No. 1-1 at 2; *see Fiorito v. Mr. Drummy*, Nos. 22-cv-923, 22-cv-925, 22-cv-927 (PJS/TNL), 2023 WL 4052639, at *1 (D. Minn. June 16, 2023) ("By his own admission, Fiorito has filed an extraordinary number of administrative grievances and an extraordinary number of lawsuits during his time in prison." (citation omitted)). According to Fiorito, the subject incident reports were just the latest acts of retaliation:

4

> In 2016 [he] was transferred to FCI Ashland in Kentucky.
> Once again staff denied [him] medical care. He again filed
> grievances requesting medical care & was threatened and
> berated every time he did so. [He] was assigned to work in the
> inmate kitchen. [He] told staff that if they served inmates
> contaminated food he would file grievances. Staff served
> inmates oatmeal riddled with rat droppings, [he] filed a
> grievance and as a result the next day staff issued [him two]
> false incident reports. One for failing to clean properly and the
> other for getting out of bed while he was on bed rest.

Ex. A-1 to Pet., ECF No. 1-1 at 2.

### b. Incident Report 2930392

On December 20, 2016, a corrections officer noticed that Fiorito "was not present to perform his work assignment." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1. Fiorito had been "assigned the task of cleaning the serving line after the breakfast meal." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1. Fiorito was "counted in Food Service for the 05:00hrs count," but, as of "06:50hrs," Fiorito was noted to be absent and the corrections officer had "not give[n] him permission to vacate his work detail." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1. The corrections officer contacted Fiorito's unit officer at "06:55hrs" in an effort to locate Fiorito. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1. As of "7:25 AM," the corrections officer had not heard back "with an answer of [Fiorito's] whereabouts." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1. As a result of his absence, Fiorito "failed to perform his work assignment" as he "had [been] instructed" and "another inmate [was required] to perform . . . Fiorito's assigned task along with their own." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1. Fiorito was charged with "[u]nexcused absence from work or any assignment" and

"[f]ailing to perform work as instructed by the Supervisor." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1.

The incident was investigated and Fiorito was given a copy of the report and advised of his rights the same day. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1, 2. During the investigation, Fiorito stated that the corrections officer had told him "if you have an assignment after the meal is completed, you can leave and come back." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2. Fiorito explained that he "went to get medication for [his] ankle and . . . had a bathroom issue." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2. He then "went back to food service and sat by a table." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2. Fiorito stated that "[t]wo inmates did the job for [him] because [he] had trouble standing" and "[i]t was too painful for [him] to stand." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2. According to Fiorito, he had "spoke[n] to [the corrections officer] before [he] left and told him that [he] could not perform the job due to [his] pain level," and the corrections officer told Fiorito "I don't care, do it anyway." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2. Fiorito stated that he "asked [the corrections officer] if someone could do the job for [him] and" was told "fine." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2. Fiorito further stated that the corrections officer "became angry with [him] because [he] brought the problem with the oat meal [sic] to his attention." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2. According to Fiorito, he and the corrections officer "have had this problem since [Fiorito] started food service over [his] medical restriction" and the corrections officer "is the only staff member that assigns [him] duties that are inappropriate." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2.

It was noted that Fiorito "did not request any witnesses when given the opportunity to do so" and "did not request staff representation." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 2.

### c. Incident Report 2931222

The following day, December 21, 2016, a corrections officer observed Fiorito standing at a walkway linking two units around 4:25 p.m. Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1. At the time, Fiorito was confined to quarters except for meals, medication, and religious services. Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1, 3. Fiorito was asked "why he was standing there," and "responded 'to see Unit team.'" Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1. The corrections officer "note[d] that there was no Unit Team on duty after hours." Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1. Fiorito was charged with "[r]efusing to [w]ork or [p]rogram." Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1.

Here too, the incident was investigated and Fiorito was given a copy of the report and advised of his rights the same day. Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1, 2. When asked about the incident, Fiorito "stated [he] thought it was PM mainline – someone yelled mainline – [he] thought it was the officer." Ex. F to Lee-Lo Decl., ECF No. 24-6 at 2. It was noted that Fiorito "requested [m]ultiple witnesses, however could not provide them at the time of investigation." Ex. F to Lee-Lo Decl., ECF No. 24-6 at 2. There was no mention of a staff representative. Ex. F to Lee-Lo Decl., ECF No. 24-6 at 2.

## 2. Disciplinary Proceedings

### a. First Attempted UDC Proceeding

Fiorito was initially scheduled to appear before the unit discipline committee ("UDC") regarding both incident reports on December 22. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5, 6; Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5, 6. Approximately five minutes before the UDC proceeding was to begin, Fiorito's unit counselor walked down to get him. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 6; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 6. Fiorito "asked to go see the Lieutenant. [The unit counselor] asked him why and [Fiorito] stated he didn't have to tell [the unit counselor] anything, but that he was in fear and needed to see the Lieutenant." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 6; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 6; *see also* Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5 ("At the time of his scheduled UDC inmate Fiorito claimed he was in fear for his safety and asked to see the Lieutenant."); Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same). Fiorito was subsequently escorted to see the lieutenant. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 6; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 6.

### b. Second Attempted UDC Proceeding

Sometime between December 22 and 28,[3] the unit counselor along with another counselor "again tried to conduct [the] UDC [proceeding] on Fiorito in the Special Housing

---

[3] There appears to be a typographical error in the relevant date in the memorandum describing the delay in Fiorito's UDC proceeding. The memorandum is dated December 28, 2016, and describes how the UDC proceeding was originally scheduled for 1:00 p.m. on December 22, but Fiorito "claimed he was in fear for his safety" at that time and "asked to see the Lieutenant." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same). The memorandum then goes on to state that "[o]n December _22_, 2016 at 9:30 a m., [the unit counselor] and [another counselor] . . . *again* tried to conduct UDC on Fiorito in the Special Housing Unit," at which point "Fiorito then claimed to be having thoughts of harming himself." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5 (emphasis added); *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same).

Unit." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same). "Fiorito then claimed to be having thoughts of harming himself," and "began speaking to [the chief psychologist] who was making his rounds at the time." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same). Approximately two hours later, the unit counselor was informed that "Fiorito had been placed in the Suicide Watch Room for observation." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same). When requesting an extension for Fiorito's UDC proceeding from the warden, the unit counselor stated that the proceeding would "be held as soon as soon [sic] as inmate Fiorito is cleared to returned [sic] to the Special Housing Unit as determined by the Psychology Department." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same). The warden approved the extension request. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 5; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 5 (same).

### c. Requests Related to UDC Proceeding

Fiorito asserts:

> Approximately a week before the hearing[, he] requested that the videos of the unit and kitchen be preserved and reviewed by the hearing officer and [himself]; [he] requested a staff rep, and [he] requested 5 witness[es] be called, a combination of staff and inmates. All requests were denied for no penological reason. [He] also requested that his medical records from the morning the incident report was written be presented to the hearing officer, for no penological reason that request was also denied.

Ex. A-1 to Pet., ECF No. 1-1 at 2.

### d. UDC Proceeding

The UDC proceeding for both incident reports was ultimately held on January 3, 2017. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1; Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1; Ex. C to Pet., ECF No. 1-1 at 11; *see also, e.g.*, Ex. D to Lee-Lo Decl., ECF No. 24-4 at 1-2. At the UDC proceeding, Fiorito requested a continuance "due to a mental health issue." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1. Fiorito stated: "Once I stop taking medication, it will improve my memory and help me better defend myself. It will also give me time to gather evidence." Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1; *accord* Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1.

The UDC found that Fiorito committed the charged conduct based on Fiorito's statements during the investigations. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1; Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1. The UDC sanctioned Fiorito to loss of e-mail privileges; 15 days for each of the charges in Incident Report 2930392 and 30 days for the charge in Incident Report 2931222. Ex. E to Lee-Lo Decl., ECF No. 24-5 at 1; Ex. F to Lee-Lo Decl., ECF No. 24-6 at 1; Ex. C to Pet., ECF No. 1-1 at 11; *see also* Lee-Lo Decl. ¶ 7; Ex. D to Lee-Lo Decl., ECF No. 24-4 at 1-2. In total, Fiorito's e-mail privileges were suspended between January 3 and March 1, 2017. Ex. C to Pet., ECF No. 1-1 at 11; Ex. D to Lee-Lo Decl., ECF No. 24-4 at 1-2.

### 3. Prior California Habeas Action

In 2017, Fiorito filed a petition for a writ of habeas corpus regarding one of the FCI Ashland incident reports in the United States District Court for the Central District of California. *Fiorito v. Entzel*, No. 5:17-cv-01894-JFW (KES), 2017 WL 6372649, at *1

(C.D. Cal. Dec. 11, 2017), *report and recommendation adopted*, 2017 WL 6375306 (C.D.

Cal. Dec. 12, 2017), *aff'd*, 829 F. App'x 192 (9th Cir. 2020). As summarized by the

magistrate judge:

> The Petition alleges that when Petitioner was housed at FCI
> Ashland, he was assigned to work in food service. He filed
> grievances against his supervisor and other kitchen workers
> "for serving inmates contaminated food" and "allowing
> 'special' inmates to steal food out of the kitchen." In
> December 2016, Petitioner reported for food service work with
> a swollen ankle. Petitioner's supervisor ordered Petitioner to
> perform work that he knew Petitioner was incapable of
> performing and ultimately filed a false incident report against
> Petitioner.
>
> Petitioner told a lieutenant at FCI Ashland that he
> wanted to challenge the report, including submitting evidence
> from other inmates who were kitchen workers and his medical
> records. When the relevant hearing was held on January 3,
> 2017, however, officials refused to allow Petitioner to put on
> any evidence and found him guilty. Petitioner appealed this
> ruling, and the appeal was denied. Petitioner did not lose any
> good time credits, but he "was given a disciplinary transfer to
> the most dangerous FCI in the BOP [Bureau of Prisons], his
> security score was artificially increased, and he lost all email
> privileges."
>
> The Petition raises three claims. First, Petitioner alleges
> that his Due Process rights were violated because he was not
> allowed to call witnesses, present evidence, or have a staff
> representative present at the Kentucky disciplinary hearing,
> and his request for a continuance to gather evidence and speak
> to his staff representative was denied. Second, Petitioner
> alleges that his First Amendment rights were violated because
> his food service supervisor issued the incident report in order
> to retaliate against him for filing grievances against the
> supervisor and kitchen staff. Third, Petitioner alleges that the
> officials at FCI Ashland violated BOP policies.
>
> The Petition asks the Court to "order the BOP to
> expunge the false incident report [and] place [Petitioner] back
> in the position he was in before it was issued."

*Id.* at *1-2 (alterations in original) (citations and footnote omitted).

The magistrate judge "concluded that the claims raised in the Petition were more appropriately raised in a civil rights action because granting the relief sought therein would not necessarily lead to [Fiorito's] immediate or earlier release from confinement." *Id.* at *2; *see also id.* at *3-4. The magistrate judge explained that, "where a federal habeas petitioner challenges a disciplinary proceeding that did not result in the loss of good conduct time or confinement in administrative segregation, the proper vehicle for such claims is a civil rights complaint rather than a habeas petition." *Id.* at *3. The magistrate judge noted that Fiorito "admits that the disciplinary proceedings he challenges did not result in placement in administrative segregation or loss of good conduct time; rather he alleges he was transferred to another correctional institution, his security score was increased, and he lost email privileges." *Id.* The magistrate judge reasoned:

> If the Court were to grant [Fiorito] the relief he seeks and expunge the incident report, this would not lead to his earlier release from custody, but merely a change in the conditions of [Fiorito's] confinement. Accordingly, his claims fall outside the core of habeas corpus and should be brought, if at all, in a civil rights action.

*Id.* The magistrate judge recommended dismissing Fiorito's petition without prejudice, noting that such a dismissal "would not prevent [Fiorito] from bringing a civil rights action in Kentucky alleging the same Due Process claims." *Id.* at *4. The district judge adopted the magistrate judge's recommendation and dismissed Fiorito's petition without prejudice. 2017 WL 6375306, at *1.

Fiorito appealed to the Ninth Circuit Court of Appeals, which affirmed the dismissal of his petition. *See generally* 829 F. App'x 192. The Ninth Circuit explained that "Fiorito was not denied good time credits or subject to disciplinary segregation as a result of his disciplinary finding." *Id.* at 193. Among other things, the Ninth Circuit stated:

> Fiorito does not demonstrate that the disciplinary hearing where he was purportedly denied due process directly resulted in his transfer to a higher security prison, or that the remedy Fiorito seeks—the expungement of his disciplinary record— will lead to his release or a lower security prison. Nor has Fiorito shown that expungement of his disciplinary finding will accelerate his eligibility for parole.

*Id.* at 194. The Ninth Circuit concluded that "[t]he district court was correct that the proper vehicle for Fiorito's claims is a civil rights action." *Id.*

## B. Instant Petition

Fiorito subsequently filed the instant Petition regarding both FCI Ashland incident reports, alleging similar due process violations with respect to Incident Report 2930392 as were raised in the California habeas action and adding in Incident Report 2931222. Again, Fiorito claims that the UDC proceeding at FCI Ashland violated his right to due process. Fiorito alleges that, at the time of the UDC proceeding, he "was on heavy psychiatric medication as a result of a bout of serious depression and anxiety." Ex. A-1 to Pet., ECF No. 1-1 at 3. Fiorito alleges that "[t]he facility psychologist informed the hearing officer that due to [his] state of mind a continuance was warranted per the law and BOP policy."[4]

---

[4] Fiorito asserts that his "mental[] incapacitat[ion] during the relevant time in 2016" was "made clear" by "BOP staff in Attachment___C___." Ex. A-1 to Pet., ECF No. 1-1 at 4. Fiorito's Petition was accompanied by 11 pages of exhibits, consisting of Exhibits A-1, A, B, and C. *See generally* Exs. to Pet., ECF No. 1-1 at 1-11. Ex. A-1 contains the factual bases for Fiorito's claims and requested relief. *See generally* Ex. A-1 to Pet., ECF No. 1-1 at 1-5. Ex. A is an administrative remedy response related to Fiorito's request that First Step Act time credits be given for his

13

Ex. A-1 to Pet., ECF No. 1-1 at 3.  Fiorito further alleges that "[t]he hearing officer denied the requests for a continuance for no reason."  Ex. A-1 to Pet., ECF No. 1-1 at 3.  As a result, Fiorito asserts that he was "denied all due process."  Ex. A-1 to Pet., ECF No. 1-1 at 3.  Respondent argues that the Petition should be dismissed for lack of jurisdiction because Fiorito is not challenging the fact or duration of his confinement.

## III. ANALYSIS

### A.  Legal Standard

A writ of habeas corpus shall not extend to a prisoner unless "[h]e is in custody in violation of the Constitution or law or treaties of the United States."  28 U.S.C. § 2241(c)(3).  "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody."  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see also Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus . . . ." (citing *Preiser*, 411 U.S. at 500)).  "If the prisoner is not challenging the validity of his conviction or the length of his detention, such as a loss of good time, then a writ of habeas corpus is not the proper remedy."  *Kruger v. Erickson*, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam) (citing *Preiser*, 411 U.S. at 499); *accord Spencer v. Haynes*, 774 F.3d 467,

---

"complet[ion of] the Non-Residential Drug Program (NR-DAP), as well as Threshold."  Ex. A to Pet., ECF No. 1-1 at 7; *see generally* Ex. A to Pet., ECF No. 1-1 at 6-7.  Exhibit B is a male PATTERN risk scoring sheet.  *See generally* Ex. B to Pet., ECF No. 1-1 at 8-9.  Ex. C is a page of "inmate discipline data," showing an excerpt of Fiorito's "chronological disciplinary record."  *See generally* Ex. C to Pet., ECF No. 1-1 at 10-11.  It includes the two FCI Ashland incident reports and, under "report remarks," notes Fiorito's request for a continuance "due to a mental health issue."  Ex. C to Pet., ECF No. 1-1 at 11.  It does no more than note Fiorito's request at the January 3 UDC proceeding and cannot be said to be a "clear" statement by the BOP that Fiorito "was mentally capacitated" at the time of the UDC proceeding.  Ex. A-1 to Pet., ECF No. 1-1 at 4.

14

469 (8th Cir. 2014). "It is the substance of the relief sought which counts." *Kruger*, 77 F.3d at 1073.

### B.  No Protected Liberty Interest Implicated

#### 1.  Loss of E-mail Privileges

At bottom, Fiorito seeks the expungement of two disciplinary actions in which he was sanctioned with the loss of e-mail privileges.  The loss of e-mail privileges does not affect the length of Fiorito's confinement.  Courts have repeatedly held that the loss of e-mail privileges does not implicate a protected liberty interest through which a prisoner may allege a violation of his right to due process in a petition for a writ of habeas corpus.  *See, e.g.*, *Wright v. Warden FCI Bennettsville*, No. 5:23-cv-00221-DCC, 2023 WL 3853461, at *1 (D. S.C. June 6, 2023); *Head v. Beard*, No. CV DLB-22-189, 2023 WL 2023217, at *3 (D. Md. Feb. 15, 2023); *Mentzos v. Bureau of Prisons*, No. 3:19CV450, 2020 WL 5645818, at *6 (E.D. Va. Sept. 22, 2020); *Abramov v. Shartle*, Civ. No. 14-6448 (NLH), 2015 WL 3407242, at *2 (D. N.J. May 22, 2015); *Gonzelez v. Zickenfoose*, No. 3:CV-13-2716, 2014 WL 257850, at *2-3 (M.D. Pa. Jan. 23, 2014); *Gray v. Holt*, No. 1:11-CV-1278, 2011 WL 4738118, at *2 (M.D. Pa. Oct. 6, 2011); *see also, e.g.*, *Wright v. Shartle*, 699 F. App'x 733 (9th Cir. 2017); *Lawrence v. Oliver*, 602 F. App'x 684, 687 (10th Cir. 2015).  It should come as no surprise to Fiorito that claims that do not challenge the validity or length of his detention are not cognizable in a petition for a writ of habeas corpus.  *See Fiorito*, 2022 WL 16699472, at *3 n.2 (noting "Fiorito undoubtedly knows this, as he has been told this many times by federal courts" (citing cases); *see, e.g.*, *Fiorito*, 829 F. App'x at 193-94; *Fiorito*, 2017 WL 6372649, at *3-4.

15

### 2.  PATTERN Score & Time Credits Under the First Step Act

Quite simply, Fiorito was not sanctioned with the loss of *any* time credits earned under the First Step Act in connection with the FCI Ashland incident reports.  While such time credits may be lost as a disciplinary sanction, *see* 18 U.S.C. § 3632(e), 28 C.F.R. § 523.43, that is not what occurred here.  Fiorito nevertheless attempts to shoehorn his due process claims into the habeas framework by asserting that, as a result of these incident reports, his PATTERN score increased and he effectively lost 12 months of time credits under the First Step Act.

### a.  Time Credits Under the First Step Act

In brief, the First Step Act of 2018 ("First Step Act"), Pub. L. 115-391, 132 Stat. 5194 (2018), "offers prisoners an opportunity to earn [t]ime [c]redits applicable to their periods of residential reentry center placement, home confinement or supervised release, by participating in certain evidence-based recidivism reduction . . . programs and productive activities."  *Salter v. Fikes*, No. 20-cv-2253 (ECT/ECW), 2021 WL 2365041, at *1 (D. Minn. May 5, 2021) (quotation omitted), *report and recommendation accepted*, 2021 WL 2354934 (D. Minn. June 9, 2021); *see also, e.g.*, *Mills v. Starr*, No. 21-cv-1335 (SRN/BRT), 2022 WL 4084178, at *1 (D. Minn. Aug. 17, 2022), *report and recommendation adopted*, 2022 WL 4080750 (D. Minn. Sept. 6, 2022), *vacated on reconsideration*, 2022 WL 19281519 (D. Minn. Nov. 9, 2022), *report and recommendation adopted*, No. 21-cv-1335 (SRN/DTS), 2023 WL 2645030 (D. Minn. Mar. 27, 2023).

"Time credits earned . . . shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. § 3632(d)(4)(C).  "[A]n inmate is only eligible to have their

time credits applied if they meet certain criteria under 18 U.S.C. § 3624(g)." *Mills*, 2022 WL 4084178, at *4. "That criteria includes having accumulated time credits in an amount that is equal to the remainder of [the inmate's] imposed term of imprisonment . . . ." *Id.*; *see also* 18 U.S.C. § 3624(g)(1)(A) (eligibility requirement that prisoner "has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment"); 28 C.F.R. § 523.44(b)(1) (time credits may be applied toward prerelease custody or early transfer to supervise release if eligible inmate has "[e]arned FSA Time Credits in an amount that is equal to the remainder of the inmate's imposed term of imprisonment"). It also includes the prisoner "maintaining a minimal or low risk of recidivism as assessed by the BOP or, alternatively, on receiving an exception to that requirement from the warden of the facility where the prisoner is detained." *Fiorito*, 2022 WL 16699472, at *5; *see also* 18 U.S.C. § 3624(g)(1)(D); 28 C.F.R. § 523.44(b)(2).

Moreover, if the prisoner's sentence includes "a requirement that the prisoner be placed on a term of supervised release after imprisonment . . . , [the BOP] may transfer the prisoner to begin any such term of supervised release at an earlier date, *not to exceed 12 months*, based on the application of time credits." 18 U.S.C. § 3624(g)(3) (emphasis added); *see also* 28 C.F.R. § 523.44(d)(3) ("The application of FSA Time Credits would result in transfer to supervised release no earlier than 12 months before the date that transfer to supervised release would otherwise have occurred."). Thus, "[e]arly transfer to supervised release effectively reduces an inmate's sentence by, at max, one year." *Mills*, 2022 WL 4084178, at *4; *see also, e.g.*, *Roberts v. Cox*, No. 4:20-CV-04187-KES, 2022 WL 742489, at *2 (D. S.D. Mar. 11, 2022) ("Further, the BOP cannot grant an inmate more

than twelve months of supervised release for earned time credits under the First Step Act."

(citing 18 U.S.C. § 3624(g)(3))).  Fiorito's sentence includes a term of supervised release.

Ex. A to Lee-Lo Decl., ECF No. 24-1 at 2.

> PATTERN is a component of the Bureau of Prison's implementation of the First Step Act's . . . system intended to reduce the risk of federal prisoners recidivating after release.  *See generally* 18 U.S.C. §§ 3631-3635; U.S. Dep't of Justice, *The First Step Act of 2018: Risk and Needs Assessment System,* at iv ("*Risk and Needs Report*"), available at https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf (last visited May 10, 2022). . . . The BOP also uses PATTERN to periodically (re)assess a prisoner's recidivism risk as minimum, low, medium, or high based on a score calculated from several factors, including the number and seriousness of incident reports filed against a prisoner in the past 120 months, and the time since the last incident report. (Pet. Attachment B [ECF No. 1-1]; Lee-Lo Exs. C, I.)  An otherwise eligible prisoner may earn time credits regardless of risk level, but a prisoner who maintains minimum or low risk over the two most recent assessments and is currently low or minimum earns time credits at a faster rate.  28 C.F.R. § 523.42.  Also, while the BOP ultimately retains discretion over whether to apply earned time credits to a prisoner's early release, a prisoner who maintains a low or minimal risk faces fewer administrative hurdles to convincing the BOP to do so.  *See generally* 28 C.F.R. § 523.44.

*Fiorito*, 2022 WL 2276734, at *1; *see* Resp., ECF No. 23 at 4; *see also, e.g.*, Ex. C to Lee-

Lo Decl., ECF No. 24-3 at 1; Ex. I to Lee-Lo Decl., ECF No. 24-9 at 1.

### b.  Not Cognizable in a Habeas Petition

Warden Fikes has aptly framed "the question presented by Fiorito's habeas petition

. . . . [as] whether he has a liberty interest in a PATTERN score sufficient to trigger due

process protections in a disciplinary action because discipline is a factor in the score." Resp., ECF No. 23 at 14. Despite initially requesting that the Court "restore his [PATTERN] score to 'low,'"[5] Fiorito has since attempted to decouple and distance himself from the inherent link in the First Step Act between an inmate's PATTERN score and eligibility to apply time credits toward time in prerelease custody or supervised release. According to Fiorito, he has "never made the argument that his status on the [PATTERN] score is/was an issue." Mot. for Judicial Notice, ECF No. 45 at 2; *see also* Reply, ECF No. 27 at 3 ("Petitioner has *never* claimed that he had a due process right to a particular [PATTERN] score."). *But see* Reply, ECF No. 27 at 6 ("The infractions from 2016 *are* responsible for pushing Petitioner into a Medium score contrary to defense counsel's miscalculations.").[6] Perhaps this is because "no constitutionally protected liberty interest is implicated when the BOP calculates a prisoner's PATTERN score and resulting recidivism risk level." *Newell v. Fikes*, No. 2:22-cv-53, 2023 WL 2543092, at *3 (S.D. Ga. Feb. 21, 2023), *report and recommendation adopted*, 2023 WL 2541126 (S.D. Ga. Mar. 16, 2023); *see also Prince v. Fikes*, No. 21-cv-643 (MJD/BRT), 2021 WL 2942311, at *3 (D. Minn. June 16, 2021), *report and recommendation adopted*, 2021 WL 2936656

---

[5] Fiorito asserts that he "*has always* been scored as a Low on the PATTERN score." Reply, ECF No. 27 at 5; *see also* Ex. A-1 to Pet., ECF No. 1-1 at 4 ("Since the [PATTERN] score was released Petitioner has always scored as a low."). This is not true. In November 2019, his score was High; in June 2020, his score was Medium; between July 2020 and March 2022, his score was Low; and, as of March 2022, his score was Medium. Ex. B to Lee-Lo Decl., ECF No. 24-2 at 1-2.

[6] Based on the record before the Court, the increase in Fiorito's PATTERN score from Low in October 2021 to Medium in March 2022 was influenced by two additional incident reports Fiorito received in February and March 2022, including an increase of "6 points because it had been less than six months since his last incident report." Lee-Lo Decl. ¶¶ 6-9; *see generally* Ex. I to Lee-Lo Decl., ECF No. 24-9; *see also* Resp., ECF No. 23 at 22.

(D. Minn. July 13, 2021) ("[F]ederal prisoners have no constitutional or inherent right to receive a particular security or custody classification.").

In any event, Fiorito's principle argument—namely, time credits under the First Step Act are akin to and implicate the same sort of protected liberty interest as so-called "good-time" credits for satisfactory behavior under 18 U.S.C. § 3624(b) that can "be vindicated through a habeas petition"—has already been considered in connection with a different habeas petition Fiorito filed in this District. *Fiorito*, 2022 WL 16699472, at *5. While Fiorito's argument was "far from frivolous" and "it is not absurd to argue that [time credits under the First Step Act], like good-time credits, might also implicate protected liberty interests that could be vindicated through a habeas petition," the district judge focused on "two critical differences between" the two types of credit. *Id.* "First, good-time credits entitle a prisoner to a reduction in his sentence, period." *Id.* Time credits under the First Step Act, however, "are not quite so straightforward" and "prisoners who earn [them] may not be able to *apply* [them]" as their application "is contingent on maintaining a minimal or low risk of recidivism as assessed by the BOP, or, alternatively, receiving an exception to that requirement from the warden of the facility where the prisoner is detained." *Id.* (footnote omitted); *see* 18 U.S.C. § 3624(g)(1)(D). The district judge additionally pointed out that,

> even when a prisoner may apply [time credits under the First Step Act], § 3632(d)(4)(C) directs that those [credits] may be applied by the BOP toward time in prerelease custody *or* supervised release. Prerelease custody, however, is just another form of BOP custody, *see* 18 U.S.C. § 3624(g)(2), and a legal action seeking transfer from one form of BOP custody to another (like a legal action seeking transfer from one BOP

20

facility to another) is not a challenge to the fact or duration of
confinement.

*Id.* (quotations omitted).  As a result, even if Fiorito received every time credit under the

First Step Act "that he could possibly have earned, the duration of [his] confinement would

not necessarily be reduced by even a single day." *Id.* (footnote omitted).  The district judge

reasoned that "[t]his contingency makes it doubtful that [time credits under the First Step

Act] are a protected liberty interest." *Id.*

Second, the district judge concluded that, "unlike good-time credit accumulated

under § 3624(b), [time credits under the First Step Act] are not a general entitlement";

rather, "prisoners are merely afforded the opportunity to earn [them] by participating in

recidivism-reduction programming." *Id.* at *6.  The district judge pointed out that "many

courts examining similar time-credit schemes have held that the loss of a mere opportunity

to accumulate credit towards a sentence is not sufficient to create a protected liberty

interest." *Id.* (citing cases).  The district judge explained that "[t]he statute and

accompanying regulations betray no expectation that [time credits under the First Step Act]

could reasonably be regarded as an entitlement, rather than as a benefit that a prisoner

might or might not be able to earn at various points during his detention."[7] *Id.*  The district

judge concluded that "[t]his is too flimsy an expectation to give rise to a protected liberty

interest." *Id.*

---

[7] Indeed, the First Step Act specifically contemplates that prisoner are to be reassessed "periodically, based on factors including indicators of progress, and of regression, that are dynamic and can reasonably be expected to change while in person."  18 U.S.C. § 3632(a)(4).

In sum, as others have explained, time credits under the First Step Act "are conditional benefits contingent on numerous factors that may result in an ability to apply [such credits] for an early release." *Smith v. Eischen*, No. 22-cv-1704 (NEB/DJF), 2023 WL 3170436, at *5 (D. Minn. May 1, 2023), *report and recommendation accepted as modified*, 2023 WL 4203165, at *2 (D. Minn. June 27, 2023) [hereinafter *Smith II*] ("[T]he application of [time credits under the First Step Act] is conditional and therefore the credits do not create the same liberty interest."). Whereas "[g]ood conduct time credit reduces a prisoner's actual time in BOP custody by awarding credit toward the service of the prisoner's sentence[, t]ime credits [under the First Step Act] . . . provide an extra incentive for inmates to participate in evidence-based recidivism reduction programs or productive activities by providing time credits that can be applied toward prerelease custody or supervised release." *Mills*, 2022 WL 4084178, at *4 n.4.

The cases relied upon by Fiorito are distinguishable. Two of them concerned eligibility for *application* of time credits under the First Step Act. *Moody v. Gubbiotti* involved a complicated fact scenario involving BOP rule changes and the effect of a state detainer lodged against the petitioner. CIV. NO. 21-12004 (RMB), 2022 WL 4976308, at *1-5 (D. N.J. Oct. 3, 2022). *Jones v. Engleman* considered the effect of pending state criminal charges and "whether the [First Step Act] allows the BOP to implement a policy precluding federal prisoners with pending criminal charges or detainers from having their accrued [time credits under the First Step Act] applied to afford them early release." No. 2:22-cv-5292-MCS (GJS), 2022 WL 6563744, at *8 (C.D. Cal. Sept. 7, 2022), *report and*

*recommendation accepted in part and rejected in part*, 2022 WL 6445565 (C.D. Cal. Oct. 7, 2022).

*Wilson v. Jones* addressed a state statute where a misconduct conviction "solely, automatically, and mandatorily" resulted in a demotion in the inmate's credit-earning classification. 430 F.3d 1113, 1121 (10th Cir. 2005). The Tenth Circuit Court of Appeals highlighted the fact that the disciplinary "conviction resulted in a *mandatory* change in credit-earning status," *id.* at 1122, and reasoned that "[t]his 'but for' causation is the kind of 'direct result' that *Sandin*[ *v. Connor*, 515 U.S. 472 (1995),] requires for a disciplinary action to have an inevitable effect on a sentence," *id.* at 1121. *Montgomery v. Anderson* dealt with a similar statute and was relied upon by the Tenth Circuit in *Wilson*. 262 F.3d 641, 645 (7th Cir. 2001). As noted above, eligibility to apply time credits under the First Step Act is "conditional," *Smith II*, 2023 WL 4203165, at *2; "prisoners who earn [such credits] may not be able to *apply* [them]," *Fiorito*, 2022 WL 16699472, at *5. This distinguishes them from the state statutes at issue in *Wilson* and *Montgomery* as well as in *Wolff v. McDonnell*, 418 U.S. 539, 546 n.6, 556-58 (1974). Moreover, a prisoner's disciplinary history is only part of a multitude of factors considered by the BOP when determining his risk of recidivism and PATTERN score, which in turn affects his eligibility to apply time credits under the First Step Act towards prerelease custody or supervised release. (And again, Fiorito is adamant that his PATTERN score is not the issue.)

Likewise, even if the FCI Ashland incident reports were expunged, this "does not mean immediate release from confinement or a shorter stay in prison" for Fiorito. *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005). At most, their expungement might arguably

affect his March 2022 PATTERN score (though Warden Fikes persuasively contends otherwise[8]).  But even that only potentially affects Fiorito's projected release date given the contingent nature of time credits under the First Step Act.[9]  *See Fiorito*, 2022 WL 16699472, at *5; *see also Smith II*, 2023 WL 4203165, at *2; *cf. Parks v. Jordan*, 573 F. App'x 233, 236 (3d Cir. 2014) (per curiam) ("[E]ven if Parks is successful at expunging the disciplinary infraction at issue, parole is not a certainty; there are other factors which could affect his chances for parole, including other disciplinary infractions." (footnote omitted)).  Fiorito could still lose time credits or have a PATTERN score rendering him ineligible to apply such time credits at the time they "equal the remainder of [his] imposed term of imprisonment."  18 U.S.C. § 3624(g)(1)(A).  Again, as the district judge previously observed, Fiorito could "receive[] credit for every [time credit under the First Step Act] that he could possibly have earned, [and] the duration of [his] confinement would not necessarily be reduced by even a single day."  *Fiorito*, 2022 WL 16699472, at *5.  As such, Fiorito's due process claims, which do not themselves "necessarily spell speedier release," lie outside "the core of habeas corpus."  *Wilkinson*, 544 U.S. at 82 (quotation omitted); *see Parks*, 573 F. App'x at 235 ("The fact that the disciplinary infraction *may* affect Parks'

---

[8] Even assuming for sake of argument that the FCI Ashland incident reports counted for two points, *see* Reply, ECF No. 27 at 13-14, a March 2022 hypothetical PATTERN score of 34 (assuming a two-point versus one-point reduction) would fall within the cut points for a Medium score, *see* Resp., ECF No. 23 at 22.

[9] Significantly, publicly available information indicates that the FCI Ashland incident reports have *not* inevitably affected Fiorito's release date as the BOP's website currently shows a projected release date in early September 2024, almost a year before the August 2025 date Fiorito himself claims he should be released.  Reply, ECF No. 27 at 2 ("So had Petitioner maintained a PATTERN score of Low, his *release date* would show as August 22, 2025.  This is important.").  (In one of Fiorito's cases, it was noted that he has since been "found in possession of counterfeit property and punished with loss of good-time credits after an administrative hearing."  *Fiorito*, 2022 WL 16699472, at *5 n.5.)

chances at parole is insufficient to bring his due process claims within the ambit of habeas.").

Because Fiorito's due process challenges to the FCI Ashland incident reports are not cognizable in habeas petition under § 2241, the Court recommends that his Petition be dismissed without prejudice for lack of subject matter jurisdiction.  *See, e.g.*, *Petersen v. Clarke*, 82 F.3d 421, at *1 (8th Cir. 1996) (per curiam); *Smith v. Warden of Duluth Prison Camp*, No. 18-cv-2555 (WMW/LIB), 2019 WL 3323063, at *1 (D. Minn. July 24, 2019); *see also Parks*, 573 F. App'x at 236; *cf. Fiorito*, 2022 WL 16699472, at *4-5.

[Continued on next page.]

## IV. RECOMMENDATION

For the reasons stated above, **IT IS HEREBY RECOMMENDED** that Fiorito's

Petition for A Writ of Habeas Corpus Under 28 U.S.C. § 2241, ECF No. 1, be **DISMISSED**

**WITHOUT PREJUDICE** for lack of subject matter jurisdiction.


Date: July____5____, 2023                          _____*s/ Tony N. Leung*_____
                                                   Tony N. Leung
                                                   United States Magistrate Judge
                                                   District of Minnesota

                                                   *Fiorito v. Fikes*
                                                   Case No. 22-cv-512 (WMW/TNL)


## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  *See* Local Rule 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in Local Rule 72.2(c).